### John G. Glover v. Deborah B. Alcott.

In an action by a married woman for property which she claims as her own, the declarations of her husband are not competent evidence against her.

Where there is no evidence as to the time when an indebtedness accrued upon which judgment has been rendered, it will be regarded as having accrued at the date of the judgment.

GLOVER v. ALCOTT.

---

If a married woman willingly allows her separate property to be so mixed and mingled with that of her husband as not to be distinguishable, or acquiesces in its being so mingled, such property, as to the husband's creditors, is to be treated as relinquished to the husband.

The statute of this State, which provides that "the real and personal estate of every married woman shall be and remain the estate and property of such married woman, "and shall not be liable for the debts, obligations and engagements of her husband, and may be contracted, sold, transferred, mortgaged, conveyed, devised or bequeathed by her, in the same manner and with the like effect as if she were unmarried," does not empower a married woman to carry on, on credit, a general trade or business — like that of the purchase of wheat and the manufacture and sale of flour — so as to make the proceeds of the business her own.

Accordingly, where a married woman was owner of a flouring mill, and her husband, assuming to be her agent, carried on in the mill the business of buying wheat, manufacturing and selling flour, mill feed, &c., as well as doing custom grinding — the business amounting to from $50,000 to $100,000 a year, and being done mostly on capital borrowed on the credit of the business — it was held, that the property acquired in the business was not protected by this statute from being liable to the debts and obligations of her husband.

*Heard October 22d. Decided November 18th.*

Error to Kalamazoo Circuit. The case is sufficiently stated in the opinion of Justice Christiancy.

*N. A. Balch,* for plaintiff in error:

The statute does not authorize a married woman, living and cohabiting with her husband, to invest her property in general trade, or herself to engage in general trade, such as the proof shows in this case: — *Gamber v. Gamber*, 28 *Penn. St.* 363; *Keeny v. Good*, 21 *Penn. St.* 349; *Switzer v. Valentine*, 10 *How. Pr. R.* 100, *and* 4 *Duer*, 96; *Lovett v. Robinson*, 7 *How. Pr. R.* 105; *Hand v. Cass*, 9 *Barb.* 366; *Freeman v. Orser*, 5 *Duer*, 479; *Raybold v. Raybold*, 8 *How. Pr. R.* 308; *Marsh v. Hoppock*, 3 *Bosw.* 478; *Gage v. Dauchy*, 28 *Barb.* 622. The statute simply gives the wife the right to acquire, hold and dispose of her property, without the consent of her husband, but not to use it contrary to the rules and practice of the common law which prevail here.

The whole business was carried on with borrowed capital. The husband, then, and not the wife, nor her estate, would be liable to pay the debts incurred to obtain

this capital. He was actually engaged in using it. It was not capital obtained by the wife in any of the modes mentioned in the statute. If obtained legally, it must have been obtained under common law rules and restrictions, and when thus obtained and placed in possession of the husband, it would by the common law be his, with all the outgrowth, issues and profits thereof.

*E. C. Hinsdale*, for defendant in error:

We insist, that if a married woman has a farm for her separate property, she may, under our liberal statutes relating to her rights, carry it on and have the crops as her own. If it is wild land, she may improve it and then carry it on. If it is a mill, she may carry on the business for which such property is alone valuable. If a valuable water power, she may with her own money and property improve it, and put it in a situation to be profitable, and then carry on the business with it thus improved. In no other way could she reap the full benefit of the provisions of the statute.

By this "the rents, profits, and income," of her estate are made her own, and her property held at her marriage, and all to which she may afterwards become entitled "by gift, grant, inheritance, devise, or *in any other manner, shall be and remain*" her property, free from her husband's liabilities.

The wife may *purchase* property, for this method of acquiring it is plainly included in the broad phrase "in any other manner"; and if she may make one purchase, she may make a thousand. She may "sell" her property, and this power carries with it the right to receive the consideration, whether of money or other property. She may "transfer" her property for a consideration paid therefor.

To carry on a business with her separate property is but to repeat the acts which the statute expressly gives

her the power to perform : — 29 *Penn. St.* 43; 39 *Me.* 119; *Ibid.* 125.

In Wisconsin and New York, the statutes on this point omit the words "in any other manner," as well as the provision making the wife liable on her contracts in relation to her property, and authorizing her to bring suit as if she were unmarried.

In the Supreme Court of Wisconsin it has been held, under the statute cited, that a married woman may not engage in trade, only so far as it may be necessary to manage the property which she may own : — 5 *Wis.* 245.

Even under this decision, the defendant in error might carry on the milling business in this case.

In New York there has been no decision in the Court of Appeals, but there have been two or three decisions in other courts there, adverse to our position. Such are, 3 *Bosw.* 478; 5 *Duer,* 479.

But the decisions in New York are not harmonious. In another case it is held, that a married woman may carry on business with her separate property : — 2 *Bosw.* 92.

The decision in this case is entirely inconsistent with that in 5 *Duer,* and the two are utterly irreconcilable.

But even if the statute does not authorize the carrying on of business like this by the wife, still the avails of the business would not belong to the husband : — 15 *Ind.* 254; 3 *Allen,* 131.

Obtaining money on a mortgage of the wife's lands created a charge upon them. The fact that the husband gave his notes only made the debt *prima facie* his; and this could be rebutted by proof. At common law, the execution by a feme covert of a security, as a bond or note, alone or jointly with her husband, purporting to create a personal demand, and not referring to her separate property, creates a charge upon her property, which can be enforced in equity : — 2 *Story Eq. Juris.* § 1400; 1 *Bro. C. C.* 16; 15 *Ves.* 596; 17 *Ves.* 365; 1 *Cr. & Ph.* 48;

GLOVER *v.* ALCOTT.

5 *B. & P.* 162; 3 *Beav.* 489; 4 *Beav.* 319; 13 *B. Monr.* 381; 16 *B. Monr.* 482; 26 *Ala.* 332; 22 *Wend.* 526.

CHRISTIANCY J.:

This was an action of trover brought in the Court below by the defendant in error, who was a married woman residing with her husband, to recover damages for the conversion of certain bags, barrels, and a quantity of mill feed. The defendant below (plaintiff in error) justified the taking and conversion as a constable, by virtue of an execution upon a judgment against William W. Alcott, the husband of the plaintiff below. The judgment was rendered on the 23d day of June, 1860, and the execution issued and levy made on the 29th day of June, 1861. It does not appear when the indebtedness accrued upon which the judgment was obtained; and so far as this point may be material it must therefore be held to have accrued at the date of the judgment.

The mill feed was manufactured at the Allcott Mills, and stored in the Allcott warehouse so called. The mill and the storehouse seem to have been carried on together, and the business done in the name of "W. W. Allcott, agent." He testifies that he managed and transacted the entire business, and that, in doing so, he acted as the agent of his wife; but one of the main questions in the case was, whether it was in truth the business of the wife, or that of the husband.

The land on which the mill and storehouse were erected was conveyed to the wife by two separate deeds, in April, 1859; but it does not appear whether it was a gift or a purchase, or by whom the consideration, if any, was paid. Nor does it appear whether she had, at the time of the conveyance, any separate property or capital of her own. The whole business of building the mill and warehouse was superintended by the husband, and, as he says, done in the name of "W. W. Allcott, agent." The sign on

the mill was, on one side, "Allcott's mills," on the other " W. W. Allcott," and on the warehouse the same. It does not clearly appear how, or by whom, the means were furnished with which the mill and warehouse were built, though it appears probable that some irons of an old mill previously burnt upon the premises, or the proceeds of them, went into the new mill; and there is some testimony having a slight tendency to show that her credit to a small amount was used in that way — though most of the witnesses swear that they knew nothing of the fact of W. W. Allcott being agent for his wife, except what he told them, and the business appears all to have been done with him under the name and style of " W. W. Allcott, agent." It appeared however that the joint note of the husband and wife, secured by a mortgage executed by both upon this real estate, was given for twelve hundred and fifty dollars of the amount. But the title to the real estate is not directly in controversy, and is relied upon by her only as the basis of her right to the personal property in dispute, which is claimed to have arisen as the proceeds of the use of the property, or rather as the joint product of the real estate, the capital or credits used in the business, and the services of the husband as her agent. And, as the debt upon which the judgment was obtained must be considered as having accrued subsequent to the conveyance to her and the erection of the mill and warehouse (which seem to have been completed in the fall of 1859), she must, for the purposes of the present case, be treated as the owner of the real estate, and entitled to the benefits legitimately arising from such ownership, at least until it should be shown by the defendant below, that the conveyances were void for actual fraud as to then existing or subsequent creditors—which it might perhaps have been competent for the defendant to do. (See *cases collected* 1 *Am. Lead. Cas.* 71 and 72). But this was not done, and no such question arises.

But it is essential to a full understanding of the case to state somewhat fully the nature of the business carried on, and the mode in which it was transacted. As already stated it was all done by the husband, and in the name and style of "W. W. Allcott, agent," and not in the name of any other person as principal; and there is no evidence that she ever performed or directed a single act, or even that she had any knowledge of the mode in which it was conducted, or of its nature or amount. The business consisted in the purchase of grain, manufacturing it into flour, selling the flour, shipping it to an eastern market, disposing of the mill feed, &c., and doing custom work. From the fall of 1859, when it commenced, down to about the time of the suit, its amount was from fifty thousand to one hundred thousand dollars per year; and, as the husband testifies in her behalf, "all or nearly all" of the business "was done on borrowed capital," most of the money being borrowed of D. A. McNair, who advanced the money for the purchase of wheat, paid the wheat receipts, and had a lien on the flour and avails of the mill, &c., till paid. There is not, I think, any evidence that a dollar of her means, aside from the avails of the business thus transacted, ever went into the business. The only testimony upon this point is [that of the husband, who, of all others, it would be supposed ought to have known the facts, and who would not be likely to omit such as might operate in her favor; and yet his testimony upon this point is exceedingly vague and indefinite, and has the appearance of having been purposely made so, to produce a general impression upon the minds of the jury that she had furnished means to carry on the business, when, upon a careful analysis of the facts stated, no such inference would be warranted. There was no agreement for compensation for his services, and he swears he never received any compensation but his support and that of his family—though he had been receiving from his brother just before for doing

the same kind of business to a less amount, two thousand dollars per year, and when asked the value of his services as agent of his wife, he says from five hundred to a thousand dollars per year.

Thirty-four promissory notes, amounting in the whole to eight thousand dollars, were executed by the husband, in May, 1859, payable to his own order, and secured by a mortgage executed by the wife upon the real estate; most, if not all these notes were negotiated; and a part of them came into the hands of McNair, and were passed, as McNair thinks, to the credit of Mrs. Alcott. The accounts were kept in the name of "W. W. Allcott, agent." The husband, being asked what became of the means raised with the above notes of eight thousand dollars, says, "it was used for different purposes; some to buy wheat, and for other purposes in and about the mill; could not say how it was all used." It is not shown that any of these notes had been paid, and some three thousand dollars of them are shown to have been in the hands of McNair's assignee at the time of the trial. These notes with the joint note of himself and wife for twelve hundred and fifty dollars already mentioned (and which was not shown to have been paid) constituted all the indebtedness of the husband of which there was any proof. An offer was made by the defendant to prove, by the admissions of the husband, that he was, during the whole time, in debt to a large amount; but this was excluded by the Court, and we think properly; the wife was not to be bound by such an admission of the husband; he might have been examined upon the point, as he was sworn as a witness in the cause, or the fact might have been proved by any other competent evidence like any other fact in the cause—and the proof would not necessarily be confined to judgments and decrees as supposed by the plaintiff's objection.

There was evidence on the part of the defendant tend

ing to prove that the mill and warehouse were built by the husband, that he purchased materials for them, that they had been in his possession ever since, and that he had constantly exercised acts of ownership over them, as though the property were all his own. The defendant, who was sworn as a witness, testified that he had no knowledge that the plaintiff had any interest in the warehouse (where the property was), or in the business; that the property levied upon was, at the time, and had long been, in the actual custody of the husband, and that he levied upon it as his.

This statement is sufficient to present the only question we deem it necessary to decide in the present case—the competency or legal capacity of the wife, under our statutes in reference to the separate property of married women, to engage in, and to carry on a general trade or business of this kind. In the present case, it is true, such was the equivocal nature of the testimony upon some of the essential points, its ambiguity, and the entire absence of any evidence upon others vital to her claim, that, when taken in connection with the fact of the husband's credit as well' as his services going into the business—if the case were before us to be decided upon the evidence stated in the bill, we should have no hesitation in saying she had failed to establish her right to the property in question, though her capacity to carry on the business were admitted. It may be a fair question, we think, whether the evidence was such as ought, without further proof, to have gone to the jury. At all events, if the whole evidence is stated in the bill, so far as it bears upon her right to the property (as we think probable from the frame of the bill), we should be justified in using the language of the Supreme Court of Pennsylvania, in a somewhat similar case (*Gamber v. Gamber*, 18 *Penn. St.* 366): "On the facts which appear in this case the Court below ought to have given a charge which would have swept away the plaintiff's claim in a single breath."

GLOVER v. ALCOTT.

A great number of exceptions were taken on the trial to the refusal of the Court to charge as requested, and to the charge as given; many of these were upon merely abstract questions, having no necessary bearing upon the case; and the charge, probably for this reason, was open to the same criticism. The charge in general was fair and impartial; except that it left to the jury some questions upon which there was no testimony. Thus, the Court, as we think properly, charged in substance, that if a married woman willingly allowed her separate property to be so mixed and mingled into a common mass with that of the husband as not to be distinguishable, or acquiesced in its being so mingled, such property, as to the husband's creditors, was, in a court of law, to be treated as relinquished to the husband. Now it was in proof by her own witness, her husband, that the money raised on his own notes and secured by her mortgage, went into the business. This was his own capital. He was the debtor, and the only debtor; her mortgage was but collateral security; and it is perfectly clear that it was impossible, from the testimony, to distinguish hers from his in the product; if, indeed, there was any evidence that any of the means used in the business were hers. The charge impliedly admits this, but asserts that it was open to explanation whether the notes were on his own account, and whether the sum received belonged to him. As no error was assigned to this, though excepted to, we are not called upon to consider it. But whether this view was right or wrong, there was no evidence in the case tending to make any explanation; yet it was left to the jury to say whether such explanation had been made. Whether there is any evidence tending to sustain or controvert a proposition, is a question of law for the Court; if there be such, its weight is for the jury. But to leave the question to the jury whether there is any evidence upon a particular point, is to make them the judges of the relevancy if not of the competency of evi-

dence. Leaving it to the jury to say whether the explanation had been made, was an implied admission that evidence had been given tending to such explanation.

But, as already intimated, the only question we deem. it necessary to discuss, is the question of the wife's competency or legal capacity, to carry on this general trade or business. The Court below held that she was thus competent; and this was the fundamental principle of the charge. We shall discuss this question in a somewhat broader form than we think is warranted by the evidence, and upon the admission of all it is claimed the evidence in any manner tends to show; that the real estate was hers, including the mill and warehouse; that the business was all, or nearly all, done upon borrowed capital, or, in other words, solely upon her personal credit and the security which the proceeds of the business furnished, and without the element of her husband's credit; that a small amount of it was obtained on the security of her real estate, and that she. may have contributed a comparatively insignificant amount of her own means (of which there is no evidence). But the broad question, whether she might not be competent to carry on such a business on her own real estate, with capital already exclusively her own, and without resorting to her personal credit, is not claimed to be warranted by the facts, and will not be affected by the decision, except so far as it may be affected by the same reasoning. The question is one not free from difficulties. The only ground on which her competency is asserted, is, that the ownership of the real estate, as her separate property, carries with it as an incident the right to use it in any manner, to the same unlimited extent as a feme sole, or any other person might do, to make it produce the greatest profit to the owner; that, as to such property, and the rents, profits and income thereof, and their management, and the uses to which she may choose to apply them, the common law disability of coverture has been entirely removed.

There is no express provision of the statute to this effect, but such enlargement of her legal capacity is inferred from the power given to the wife over her separate property by the statute of 1844 (*Comp. L.* § 3289), and that of 1855 (*Comp. L.* §§ 3292 to 3295).

It is quite clear, we think, that the act of 1844 did not enlarge the capacity of a married woman to the extent claimed, if it did even give her any right to use or manage the property against the will of the husband. It simply declared that "any property, real or personal," acquired by her in any of the modes authorized by the act, "and the rents, profits and income of such real estate, shall be and continue the real and personal estate of such female, after marriage to the same extent as before marriage; and none of said property shall be liable for her husband's debts, engagements or liabilities, but shall be liable for all debts of the wife contracted prior to her said marriage." And this is followed by the proviso, that "nothing in this section contained shall be construed to authorize any married woman to give, grant or sell any such real or personal property during coverture, without the consent of her husband, except by order of the Judge of Probate, or of the proper court of the county; and that, upon a separation between such husband and wife, saving by an adjudication of court, such married woman shall, in no case, be authorized to remove any such property from the premises of the husband without his consent." And the act further provides that, "if any married woman shall die without disposing of such real estate" (with the consent of the husband or leave of the court must be understood) "he shall have a life estate therein by the curtesy."

But it can not be denied that the act of 1855 is an enabling act, and removes the common law disability of coverture, so far, at least, as to enable her to "contract, sell, transfer, mortgage, convey, devise, or bequeath" any of her sole property which she is authorized to acquire

or hold under the act, "in the same manner and with the like effect as if she were unmarried." To this extent the power is express; but whatever may be the inferences to be drawn from the statute, this is the extent of the powers expressly conferred. This statute does not, like that of 1844, expressly give her the "rents, profits and income of her real estate," but, as it makes her complete proprietor, with the absolute power of disposition, without any control from her husband or any court or tribunal, we think the "rents, profits and income" of such real estate, as well as the profits and income of her personal estate (which are not mentioned in either statute), must belong to her, as an incident necessary to its beneficial enjoyment, which we think it was the policy of the statute of 1855 to secure to her.

But whatever may be the extent of her power to bind herself by contract, under the third and fourth sections, and the amendment of 1857 (though we think these powers must be construed as having reference mainly to the sole property and its management), it is clear that the statute is entirely silent as to her right to *manage her property by the application of her time and personal services.* And, as at common law her time, services and earnings belonged to her husband, and the statute no where expressly professes to deprive him of these rights, in any respect, or to relieve her from the duties they imply, and can not be construed to limit such rights and duties otherwise than as the power expressly or impliedly given her over her separate property may operate as such limitation by implication; it is clear that her right to devote any part of her time and services to the management of her own separate property (which must thus far limit the husband's common law rights) must depend entirely upon *inference.* The powers to be inferred should, therefore, be such as to harmonize with the common law rights of the husband, as far as they reasonably may, consistently with the purpose

for which they are inferred, so as to avoid all unnecessary
conflict. It was clearly not the purpose of the statute to
deprive the husband *generally* of his right to the time,
services and earnings of the wife, or to relieve her from
the performance of her household and conjugal duties.
But, leaving these in full force *generally* as they existed
at common law, the statute has adopted a principle in
reference to such property as she may separately own,
which may incidentally modify her husband's rights and
her corresponding duties, so far, and so far only, as may
be necessary to enable her to obtain the legitimate income
or enjoyment of *such property.* The power to dispose of
her property, by fair implication gives her the right to
apply so much of her time and attention to this object
as may be reasonably required for the purpose. But it
does not necessarily follow that, because the statute has
secured to her the income and profits of her separate
property, it has therefore authorized her to engage in any
and every kind of general business which might be carried
on *with it or upon it*, and given her the profits and
income of *the business* as well as the property. Here is a
*distinct element* entering into the product, beyond that of
the income of her separate property. We do not mean
to say that she would, in no case, be entitled to the
product into the production of which this element might
enter, nor that she would be prevented in all cases from
carrying on any business with her separate property. This
might depend upon the nature, circumstances or neces-
sities of the case. Thus, for illustration, had this mill been
used by her only for custom work, grinding for tolls; or,
had she received by devise, or gift, or inheritance, or by
purchase on mortgage or execution for a debt due to her
(and possibly by purchase otherwise) a mill already stocked
with grain, and which prudent management would require
to be manufactured into flour before sale ; she might be
entitled to use the property in this way for this special

and temporary purpose, and still be entitled to the product.

But, while it is clear that she may sell any of her property and invest the proceeds at interest or in other property, as occasion may require, and it may be difficult, perhaps impossible, to lay down any general rule applicable to all cases, by which her right to continue and extend these operations, and to devote her time and services to the management of her property, may be governed; and it may be necessary to leave each case to stand mainly upon its own peculiar facts; yet, we think, as a general rule, her rights do not extend so far as to enable her to enter into *a general trade and business*, like that here in question, and which is to be carried on mainly upon credit; or any other general business thus carried on, the proper attention to which, by herself, would be calculated to require the employment of her time and services generally, to an extent which (if properly attended to) would deprive the husband substantially of all her services and earnings, and render her incompetent to perform her obligations to her husband, or the ordinary duties pertaining to the household. If it were competent for her to carry on such general business wholly or mainly by means of her own capital (upon which we express no opinion), yet, to authorize it when done mainly upon credit, would be going entirely beyond the purpose for which the power is inferred—the management and use of her separate property in such manner as to enable her to obtain the legitimate profit and income of the *property*, and would be making the business the *principal*, and her separate property only a *minor object*. If this were permitted, and the wife were allowed to enter into such a business as a permanent occupation, any woman who might find a friend to give her a vacant lot, or ten dollars in money, or even a small credit, would have it in her power to deprive her husband entirely of all right to the time and services of the wife in the care and management of his household.

We see nothing in the statute to satisfy us that the Legislature contemplated so radical a change in the legal relations of husband and wife, while they continue to live together and he is competent to the transaction of business, and guilty of no gross neglect of his duties to her and his family. But the husband must, as a general rule, still be regarded as the head of the family, and as the only one of the two authorized to carry on such general trade and business. And when such business as that here in question may be carried on by the joint efforts and credit of [the two, such business, in ordinary cases, must be considered in law the business of the husband, and its avails liable to the payment of his debts.

We do not speak here of any business or trade usually carried on by females, and which consist largely, and almost necessarily, of female labor, which may be resorted to as a means of support for the wife or family, and which is not of a character inconsistent with a proper attention to her family duties—such, for example, as that of a milliner. Such trades may stand upon a different ground, and we express no opinion upon them. Nor do we express any opinion upon the right of a wife to carry on a farm as a direct means of support for herself and family, though the labor may be done mainly by her husband. We confine ourselves entirely to the question of her legal capacity to carry on a general trade or business upon credit, or mainly upon credit, in cases like the present, and those involving the same considerations.

The whole subject is beset with difficulties which must be met as the cases may arise. The object of the statute in securing to the wife her separate property was a benevolent one: and if the statute be confined to the object in view, its operation will be highly beneficial, in securing married women and their families from the consequences of the extravagance or misfortunes of husbands. But, while it should be fairly and liberally construed for these

purposes, the greatest care and circumspection are required to guard, as far as possible, against its being made a mere cloak for the frauds of the husband upon his creditors, of which it is peculiarly susceptible; and which it was no part of the legislative design to facilitate.

We have discussed the question of the wife's right to devote her time and services to the management of her own property and business, and the extent of that right, not because of any services of the wife in the present case—for there were none—but as bearing upon the extent of the power *intended to be conferred* by the Legislature.

The danger to be apprehended to the rights of the husband from permitting her to carry on such general trade and business may be less than that which is likely to result to creditors of the husband, by putting it in his power to carry on his own business to any extent under the cloak of an agency for the wife. The relation between husband and wife is the most confidential existing in human society; and while under our statute the wife may be a witness for the husband and the husband for the wife, neither can be called to testify against the other without the consent of the party against whom the testimony is sought. Under such a system it is easy to see that frauds upon creditors may be perpetrated to any extent without the possibility of detection, if the wife is allowed to carry on business like the present through the agency of the husband. If the right of the wife could be sustained upon the evidence in the present case, it would exhibit the danger to be apprehended in a startling manner. The burden of proof was upon her to show that the property was hers. As she is not shown to have had any such exclusive possession as would dispense with proof of title—the naked possession being in the husband, and tending more to prove his title than hers—and as the property was the product of the business; she must, to establish property in herself, show that the business was hers. But she does not show that a

dollar of her capital went into the business; while it is clear beyond dispute that capital raised upon his notes—on which he was the only debtor—was so employed. It was transacted mainly (and so far as the evidence shows entirely) upon credit; but it does not appear that this credit, to the amount of a single dollar, was properly hers. The principal amount—that advanced by McNair—was but nominally upon her credit, and really upon the credit and security of the business itself, transacted, as it was, by the husband, and upon the avails of which McNair held a lien till paid. So far from her having devoted one moment's time or attention to this large business of from fifty thousand to one hundred thousand dollars per year, it does not even appear that she knew anything more of its nature or amount, or of the mode in which it was transacted, or took any more interest in it than any other person in that vicinity. The whole was transacted by her husband, he devoting the same time and attention to it as if it were his own, claiming no compensation, and furnishing funds raised upon his own notes. And it may with truth be said that the only circumstance shown by the evidence to distinguish this business or the mode of its transaction from what it would have been, had it been confessedly his own, was the addition of the word "agent," at the end of his name, in keeping the accounts, &c., and upon one end of the mill and warehouse; while upon the other appeared his own name, simply, without the addition of this potent word.

The judgment should be reversed, with costs, and a new trial granted.

Martin Ch. J. and Manning J. concurred.

Campbell J.:

The questions in this case arise concerning the right of a married woman, under our statute, to carry on a general milling business in her own mill, with the consent and under the management of her husband.

I do not think that we, as an appellate Court, acting upon objections presented by exceptions and brought up by writ of error, are entitled to base our judgment on any view we may take of the facts different from the result arrived at by the jury. We could not look into the evidence for any such purpose, even if it were all before us, which it is not. If the law of the case, as it stood before the Court below, was properly determined there, or if there were no errors committed by the Court below which were excepted to and assigned in error, we have no choice but to affirm the judgment. The case may be peculiar, but, as it appears to me, the peculiarity is largely dependent on the facts, more than upon the principles of law involved.

It is extremely difficult to harmonize the provisions of our laws relating to the powers and privileges of married women with any of the common law doctrines, or with the mongrel principles applicable in common law countries to their separate estates as administered in courts of equity. The rules of the common law in regard to the powers of married women to contract, were entirely repugnant, in many respects, to those entertained in courts of equity. Neither of the systems had any especial reference to the peculiar personal rights and duties of the marriage relation itself. Those rights and duties are mainly independent of property considerations, and are not in any country necessarily affected by them: — *Bish. on Mar. and Div.* §§ 37, 38. And I think we are much more likely to arrive at safe and just results, if we regard our Constitution, and the laws which have been passed on this subject, as intended not to patch up and mend with discordant materials any old system, but to substitute a new one, and sweep away entirely every portion of the old one which covered any part of the same ground. We must assume that the people and the Legislature understood what risks were incurred, and determined that any such risks, if they should exist,

were less evils than those which were before experienced. It is not to be expected that all persons will look with the same eyes upon these or any other extensive innovations. But to my mind it seems plain that a radical change was designed, and has been effected, and must be acquiesced in.

By the statute of 1855 it is provided as follows, viz: "That the real and personal estate of every female acquired before marriage, and all property, real and personal, to which she may afterwards become entitled, by gift, grant, inheritance, devise, or in any other manner, shall be and remain the estate and property of such female, and shall not be liable for the debts, obligations and engagements of her husband, and may be contracted, sold, transferred, mortgaged, conveyed, devised, or bequeathed by her, in the same manner and with the like effect as if she were unmarried:" — *Laws* 1855, *p.* 420. Sections three and four as amended in 1857 allow her to sue in her own name, upon all her contracts and rights, and also in all cases where a husband has unlawfully disposed of, or incumbered, property which the law will not allow to be disposed of without her consent. They also exonerate the husband from suit on her contracts relating to her sole property, and subject her to suit on all her contracts on which the husband is not liable, or where he refuses to perform such contracts:—*Laws* 1857, *pp.* 359, 360.

The statute which gives to a married woman the same power she would have possessed if unmarried, gives her all the power which any one can possess; for an unmarried woman can make any contract which can be made by a man in regard to his property. Nor is the property concerning which the power exists limited to that which is acquired by any particular method. It may be acquired *in any manner*, unless there is something in the marriage relation itself which prevents this in regard to particular methods of acquiring property.

It was not claimed on the argument, nor can it be

11 MICH.—2 F.

consistently asserted, that a wife is, under our statute, incapacitated from doing any act which could lawfully be done, either at law or under the rules of equity as recognized in England. And it is equally clear that nothing can be regarded as a necessary and inseparable incident of the marriage relation, which could be lawfully dispensed with at common law or in equity.

I have been unable to find any limitation on the power of a married woman to acquire property, or to incur liabilities, on the credit of her separate estate. Questions have sometimes arisen concerning the manner in which her intention to bind her separate property must be signified. The English doctrine goes upon the simple and intelligible ground that, whenever she makes a promise to pay, she must be presumed to intend that promise to become operative; which can only be in regard to her separate estate:— 2 *Spence Eq. Juris.* 515 *et seq., and note, p.* 539. Our statute of 1857 is quite as explicit. But all the authorities agree that she may make the contract, if it is specifically charged. And any such property is, under our statutes, the sole property of the wife.

Nor is there anything in the relation of husband- and wife to prevent the wife from becoming in any event a sole trader. And where she is a sole trader she possesses and may exercise the same right of buying and selling on credit, as well as for cash, that is possessed by any other person. By the custom of London, a wife might trade on her own account, and was subject alone for her debts, her husband not being liable:— *Cro. Car.* 68, 69. As a sole trader she was liable to bankruptcy proceedings, precisely like all other merchants:— 3 *Burr.* 1784; 1 *W. Bl.* 570.

So, by the general rules of equity, a wife might become a sole trader in pursuance of an ante-nuptial agreement, or a post nuptial agreement on a valuable consideration; and in either case she was protected against her husband

and his creditors:—2 *Spence Eq. Juris.* 503; 2 *Story Eq. Juris.* §§ 1385-6-7. And in such cases, where trustees intervened, her rights were protected at law as well as in equity (*same authorities*).

It is very evident, therefore, that there is nothing in the relation of husband and wife which necessarily precludes a wife from transacting business on her own account, and for her own benefit. It is somewhat difficult to determine, from a system like that of the common law, what incidents were supposed to spring from the relation itself, and what from the rules of property. The husband's dominion over the wife's personalty, being absolute, would embrace her earnings, because it embraced everything. It is very clear that a husband had no right to hire out his wife's services as he pleased, or to compel her to labor away from her home. The only services which he could assert a claim to, from the nature of the relation itself, are household duties, connected with the care of the home and family. These duties it is fair to attach to the marriage relation, as responsive to the duty the husband assumes of providing for and protecting his family. That a wife can not undertake any business which will prevent her performing these primary duties against her husband's will, so long as he faithfully performs his corresponding duty, may be laid down as a general rule, and perhaps a rule which is universal. But beyond this it seems to me our statutes do not go in controlling her action concerning her own property. And this limitation, as we have already seen, is one which may be removed by her husband's consent. No one else is concerned in it, and if he is willing no cne else can complain.

If, as in the case before us, a wife owns a mill privilege, it must either be left entirely unproductive, or it must have a mill placed upon it. If she can not procure the erection of a mill upon it, then she c n not do as she would, were she unmarried, with the same property.

The statute can not certainly be so construed as to give her no right except to keep it unimproved, or else to sell it. Even in New York, where the courts have not been liberal in carrying out these laws, it has been held that a wife might contract for the improvement of her real estate, and that such a contract, made by her husband as her agent, was legally valid: — *Hauptman v. Catlin,* 20 *N. Y.* 247.

When the mill is finished she must either rent it or run it herself. Such property can not always be rented, and there is no legal incapacity to prevent her using it as other owners, whether men or single women, use their mills. If her husband is unwilling to allow her to attend to it personally, she can only do so as far as she does not omit her domestic duties. If it require more care she must employ some assistance. But should she neglect her home for her business, it is not easy to perceive in what way it concerns third persons. Neither would such a breach of duty render such property her husband's. The law has provided for no escheat or forfeiture for such domestic faults. But with her husband's consent there can be no difficulty. The case does not differ from any other trading or business, except that what could formerly be done only indirectly, and through an equitable process, is now legal, and may be recognized and protected in all courts. Any attempt to lay down restrictions or qualifications becomes arbitrary, and beyond the judicial province.

If any agent is to be employed, it certainly will conduce more to harmony and domestic peace to allow the husband to act as such agent, if the wife sees fit to select him. There is certainly no recognized rule of law to prevent it. A married woman could formerly at law appoint no agent, and of course could not appoint her husband. The marital relation is no obstacle, for a husband could always appoint his wife to act for him, and each could deal with the other when acting in *auter droit.* By separating their legal

interests the statute has made each free to transact business alone, and therefore removed the disability of the wife to act through an agent. The husband is certainly as fit as any one; and there is no more reason why he should be disqualified for this office than for that of a trustee for his wife, which he always might be. And the husband has been recognized as a proper agent, in *Southard v. Piper*, 36 *Me.* 84; *Colby v. Lamson*, 39 *Me.* 119; *Manderbach v. Mack*, 29 *Penn. St.* 43; *Hauptman v. Catlin*, 20 *N. Y.* 247.

Unless there is an absolute and universal disqualification, then, there is no rule of law which will enable courts to discriminate between one agency and another.

That such a relation may afford means to conceal frauds is undeniable, but the law has never prohibited all acts which may facilitate fraud; and it will never presume either fraud or conspiracy; both of which must be made out in order to justify a conclusion against the honesty of such transactions.

It was suggested on the argument that it does not appear affirmatively that the property in this case was purchased with the means of the wife. There is an abundance of evidence that it was a part of the stock of a business which had been carried on in her mill, and, nominally at least, as her business. Apart from this fact, the mere fact of possession by the husband would not make out a *prima facie* case on either side to determine his or her title. These circumstances were certainly admissible evidence, and had a legitimate bearing on the issue. Together with other facts they satisfied the jury. There is no ground on which we have a right to disregard their finding except that which is laid down by the courts of Pennsylvania, in a series of cases referred to on the argument, that personal property claimed by a married woman shall be presumed to have been bought with her husband's money, unless the contrary is proven beyond a reasonable doubt. I know of no basis for any such doctrine. Under

GLOVER v. ALCOTT.

the old rule it was well enough, for the presumption then was that the property itself belonged to the husband. But when a married woman has the same control over her property with all other persons, a rule which requires her to prove her ownership by more or different evidence than is required of others, is purely arbitrary, and imposes a burden which courts have no right to impose.

Fraud, in such cases, is a question of fact, and not of law. I think in the case before us the Court below presented the whole case to the jury with great fairness. The peculiar character of the transaction was fully commented on, and their attention was called to every thing which could throw light on the case. Their verdict was not disturbed by the Circuit Court, and I have not been able to discover any legal ground for disturbing it. It is not claimed that if the business had been conducted by Mr. Allcott for a brother, or a person not related to him, the case would not, under the charge given, have been fairly presented to the jury. The real facts are such as to require from a jury a much sharper scrutiny, and are much more suspicious, than if the married relation did not exist. This, however, was fairly laid before them, and we must presume their deliberate conclusion was arrived at by regarding it. Inasmuch, therefore, as I think there was no error in the charge of the Court, nor upon the trial, I am of opinion the judgment should be affirmed.

*Judgment reversed.*

NOTE—The names of C. S. May & Briggs as counsel for defendant in error in this case were accidentally omitted from the proper place.