## GATES *v.* UNION TRUST CO.

1. ASSIGNMENTS FOR BENEFIT OF CREDITORS—CLAIMS—HUSBAND AND WIFE.

Petitioner's husband made a trust deed of all his property for the benefit of his creditors, to which was attached a schedule of his debts, including $15,000 to his wife, which was the consideration for her joining in the trust deed. After the payment of this claim she presented one for $82,000, most of the items of which were over six years old, and some had been running over thirty years. There was no note, book account, or other written evidence of the claim, no settlement had ever been had between petitioner and her husband, and the husband had never included this debt in any statement made by him to the banks or commercial agencies. *Held*, that the claim should not be allowed.

2. SAME—ESTOPPEL.

Where a married woman joins in a trust deed for the benefit of her husband's creditors, with the understanding that she is to have no share in the proceeds resulting therefrom beyond a scheduled claim, she is estopped from afterwards presenting other claims.

Appeal from Wayne; Rohnert, J. Submitted November 22, 1901. (Docket No. 75.) Decided April 22, 1902.

Petition by Louise M. Gates against the Union Trust Company, receiver of Samuel G. M. Gates, for the allowance of a claim. From a decree for petitioner for part of her claim, both parties appeal. Reversed in favor of respondent.

*Simonson, Gillett & Clark* ( *T. A. E. Weadock*, of counsel ), for petitioner.

*Russel & Campbell* ( *Elliott G. Stevenson*, of counsel ), for respondent.

MOORE, J. In August, 1899, Mrs. Gates filed a petition in this proceeding, in which she claimed her husband owed her upwards of $82,000. On the hearing the claim was amended, and, omitting the claim for interest, was for a little more than $50,000. The circuit judge allowed the claim at $8,256.77, the items allowed being rent of one-quarter interest of sawmill for six years, with interest, and rents collected by Mr. Gates, within six years from the filing of the petition, from properties the title to which stood in Mrs. Gates. Both parties appeal.

In August, 1896, Mr. Gates made a trust deed, under which deed the Union Trust Company was appointed receiver, and is administering the trust under the direction of the court. Among other things stated in the deed is the following:

" A schedule of the property and interests hereby conveyed, marked 'Exhibit A,' is attached hereto, the same being made as complete as may be; but it is the intention of the parties of the first part to convey all of the property and interest of the said S. G. M. Gates, whether included in said schedule or not. The list of the names of the creditors of the said S. G. M. Gates, and the amounts of their claims, is also hereto attached, marked 'B,' and made as complete as may be; but it is the intention of this instrument that all creditors shall be paid, whether included in said list or not."

Mrs. Gates' name appears in Schedule B as follows: "Louise M. Gates, preferred, $15,000." She is not otherwise referred to in the schedule.

Mrs. Gates joined in the trust deed. The provision of the instrument for payment to her is as follows:

"As soon as it may be safely done, out of the profits of said business or the proceeds of said property to pay to said Louise M. Gates, wife of S. G. M. Gates, in consideration of the release and transfer hereby made by her of her inchoate right of dower and other interests in the property hereby conveyed, the sum of $15,000, with interest from date."

In relation to this trust deed Mrs. Gates testified:

"I knew he was making an assignment for the benefit of his creditors, conveying to the trust company all his property for their security and benefit. I knew there was attached to that paper a list of his creditors, but I never saw the list. I knew I was preferred for $15,000. I understood it was made to cover or secure all of his creditors, but not intended to secure me. It was my intention not to make a claim, but to adjust my matter with him after he got through with this business. For that reason I understood I was excepted from the creditors in that security."

Testifying in relation to the same matter, Mr. Gates said:

"The claim of Mrs. Gates was not included or meant to be included in the $15,000. This $15,000 was to enable her to take care of her property. The consideration for the $15,000 is her dower interests and the surrender of the Center-street property. At that time the list or schedule of the trust company did not contain all my creditors. It did not contain the claim of Mrs. Gates. It was not on my books, and the claims were made up from my books by my bookkeeper. I knew of my indebtedness to her. The only reason why it was not put in was that I believed that it would pay out, and I was anxious for the debts to be paid. I supposed there would be a nice sum left."

After the giving of the trust deed some question was raised as to the *bona fides* of the $15,000 preferred claim.

September 1, 1896, Mrs. Gates filed with the receiver a statement, to which is attached the following:

"This statement is furnished the Union Trust Company by Mrs. Gates to satisfy it that she is a *bona fide* creditor of S. G. M. Gates to the extent of $15,000. Interest is neither charged nor credited, and the other items are omitted which would increase this claim."

An order was made in the case requiring creditors to present their claims on or before November 1, 1897. After Mrs. Gates was paid the $15,000, she filed a petition, dated August 31, 1899, claiming her husband owed her unsecured claims, which, after giving him certain credits, left him her debtor to more than $80,000. The claim is made up as follows:

"1. $1,100 cash, claimed to have been loaned by Mrs. Gates to her husband July 31, 1864; interest for 32 years 2 months.

"2. Rent at $1,500 per year for the use of one-quarter of Gates & Fay's sawmill from January 1, 1865 ( the one-quarter interest having been purchased in 1864 for $2,000), $47,375; interest for 31 years 7 months.

"3. Rents collected by Gates from houses which had been conveyed by Gates to Mrs. Gates, the rent items covering a period from October, 1872, amounting, without interest, to $8,718.66.

"4. A claim for the value of more than 5,000,000 saw logs said to have been purchased in 1891 for Mrs. Gates by Gates, $20,044.94.

"5. $6,000 loaned by Mrs. Gates to Gates in 1881, the proceeds of a mortgage on the homestead conveyed by Gates to his wife.

"6. $1,926.50, items paid by Mrs. Gates for household expenses during a number of years.

"7. $1,100, board of a nephew and employé of Gates for five years and seven months prior to Gates' failure."

The credits stated upon the account are as follows:

"1. Conveyances of real estate at four different times, aggregating $21,335, according to the statement of consideration contained in the instruments.

"2. Sundry items of money or merchandise furnished

Mrs. Gates, and charged to her on Gates' books of account, aggregating $2,857.79.

" 3. A credit given in the account for what is stated to be Mrs. Gates' share of expenses of logging at Mercer camp, amounting to $12,000."

It appears from the testimony of both Mr. and Mrs. Gates that no lease was drawn for the rental of the mill, and no agreement made as to the amount of the rental; that no note or written evidence of debt was given for any of these items; that no charge or credit was made or given on any book kept by either Mr. or Mrs. Gates for any of these items. Mrs. Gates testified:

" I purchased the quarter interest in the mill for $2,000. I never received any rent from it, nor kept any account of it. I have no books or records of any kind showing these transactions with my husband; nothing except as the deeds and contracts show.` This account has been made up from papers that were in existence since my husband failed. I had no record or books of any kind showing this transaction. I always carried it in my mind, though not entirely, because I talked it over with Mr. Gates several times. I never got any money from Mr. Gates."

In testifying about one of the items which she now claims is a credit on the account, she said:

" At the time I received this deed I did not give him a receipt for the amount. I had nothing to indicate that I had, by the receipt of this deed, received any part of the indebtedness. It was a small matter between us. I didn't consider it was necessary. I did not know that it would ever come up."

At another place in her testimony she said:

"That is the same mill for which I paid $2,000 for the quarter interest. Gates & Fay improved it. The mill earnings ran some years $20,000; never less than $16,000; and in these transactions I never charged him more than at the rate of $6,000. I charged him verbally always. I said I expected a settlement at $6,000, and I expected $1,500 for my portion. I demanded it every year, but he put me off. * * * I never made out any bill for rent to Mr. Gates, or Fay & Gates, and never gave them any receipt

to apply upon it. No conveyance was ever made to me, or any other payment, for part of the indebtedness, and never had any understanding with them that anything should apply upon any part of the indebtedness,—any of these conveyances, or any other payments, for part of the indebtedness. I expected to credit him when we got to a settlement."

No settlement was ever made between them.

Mr. Gates, on the cross-examination, testified as follows:

"I did not discuss the question of why I did not want to include Mrs. Gates' claim in the list of creditors. It was just a matter in my own mind. I remember meeting you and Mr. Russel in the Trust Company Building. I remember a meeting in Mr. Collins' office in Bay City, at which Mr. Russel and Mr. Stevenson were present. Perhaps the question whether this $15,000 should be included in the trust conveyance was discussed. I don't remember whether I indicated to you that Mrs. Gates had any claim outside of that $15,000. I don't know as I had, prior to the mortgage, ever made any statement of my liabilities to the company which included any claim of Mrs. Gates. I have made statements of my condition,—such statements as annual statements. I have made a statement to the Second National Bank of Bay City. I gave my assets and liabilities. I don't know whether it included anything of liabilities to Mrs. Gates. I have made statements to the commercial agencies. I did not make specifically any statement of an indebtedness to Mrs. Gates. I do not remember of ever including among my liabilities any sum added to my liabilities consequent upon anything due Mrs. Gates."

Without reciting this testimony more in detail, or attempting its analysis, we say of it we think it fails to establish a legal claim on the part of Mrs. Gates against her husband. On the contrary, we think the claim stale, and its presentation an afterthought. See *Glover* v. *Alcott*, 11 Mich. 479; *Ball* v. *Phenicie*, 94 Mich. 356 (53 N. W. 1114); *Winslow* v. *Putnam, ante,* 359 (90 N. W. 43).

In *Davis* v. *Zimmerman,* 40 Mich. 24, it is said:

"The plaintiff [defendant] sought to estop the wife

from claiming the property as against his mortgage by showing that the mortgage was given in part for her own board, and that she, knowing that fact, failed to notify defendant of her claim. Had she known at the time that the defendant was to take a mortgage as security for the payment for her board subsequently, and failed then to assert her right, there would be justice in setting up an estoppel against her."

Counsel say:

"The case of *Davis* v. *Zimmerman,* 40 Mich. 24, cited by respondent's counsel, is not in point. In that case the wife allowed her husband to mortgage her individual property, and was afterwards held estopped from asserting her title thereto. In other words, the wife was attempting to attack the validity of the mortgage itself, and to assert a prior title to the specific property affected thereby. A similar question would arise in the case at bar if Mrs. Gates, having joined in the trust deed, should now claim the absolute ownership of the property conveyed thereby, and should attempt to place it beyond the reach of the creditors. We make no such claim. We assert no rights to the specific property conveyed, but merely a personal claim in the nature of a debt against Mr. Gates. The court, in *Davis* v. *Zimmerman,* did not and could not have held that the wife had lost her personal claim against her husband, even though she may have lost by estoppel her right to reach and retain specific property mortgaged by her husband under circumstances creating a clear case of estoppel upon her part."

We think counsel are in error. This is not a proceeding to enforce a claim against Mr. Gates personally. It is true it is not an attempt to set aside the trust deed, but it, in effect, seeks to accomplish the same purpose, by subjecting the proceeds resulting from the administration of the trust to the debt of the petitioner, and thereby diminishing the fund, which is already too small to pay the other creditors. The testimony discloses that, when Mrs. Gates joined in this trust deed, she understood, as did Mr. Gates, she was to have no share of the proceeds resulting therefrom beyond the $15,000. She should now be estopped from claiming the contrary. We think the court erred in allowing any part of the claim.

The decree of the court below is reversed, and one will be entered here in favor of the appellant trust company, with costs of both courts.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred. LONG, J., did not sit.