# CHARLESTON.

## TRAPNELL, *et al.* v. CONKLYN, *et al.*

(LUCAS, P., absent.)

Submitted September 9, 1892.—Decided December, 10, 1892.

1. HUSBAND AND WIFE—SEPARATE ESTATE—MARRIED WOMAN.
     Property purchased by a married woman from a person other than her husband is her separate property, although purchased on credit and paid for out of profits arising from its use by her, and although when purchased she had no separate estate.   (p. 247.)

2. HUSBAND AND WIFE—SEPARATE ESTATE—MARRIED WOMAN.
     A married woman owning separate estate, and living with her husband, though she may not engage in business generally, may employ such estate in business to which it is adapted; and, though her labor and skill enter into the employment of such estate, the profits are her separate estate, as also any property purchased therewith.   (p. 249.)

3. HUSBAND AND WIFE—SEPARATE ESTATE—MARRIED WOMAN.
     Section 13, c. 66. Code 1887, relates not to wives living with their husbands, employing their separate estate in business, but only to those living separate and apart from their husbands. That section does not prohibit wives living with their husbands and owning separate estate from engaging with it in business.   (p. 250.)

4. HUSBAND AND WIFE—SEPARATE ESTATE—MARRIED WOMAN.
     The fact that an insolvent husband voluntarily bestows his labor and skill in the business of farming carried on by his wife upon land, which is her separate property, and operated with her separate property, will not in the absence of fraud render the products the property of the husband and liable for his debts. If such products, after the support of the family, leave a surplus in property attributable to his skill and labor, equity would make a just apportionment between wife and creditors.   (p. 250.)

5. HUSBAND AND WIFE—SEPARATE ESTATE—MARRIED WOMAN.
     The marital relation does not prevent the husband from acting as his wife's agent in managing her separate estate.   (p. 252.)

6. PARENT AND CHILD—FATHER AND CHILD.
     Though a father is entitled to the services of his minor child, and property coming from his labor is liable to the father's debts, yet the father, though insolvent, may emancipate the child, and then the child's services will no longer belong to the father, or his earnings liable to his debts.   (p. 253.)

7. PARENT—CHILD—FATHER AND CHILD—MARRIED WOMAN—SEP-
ARATE ESTATE.

If a minor child, with the father's consent, give his mother the
benefit of his labor on her separate estate, profits wrought by the
child's labor will not be liable for the father's debts.   (p. 254.)

8. HUSBAND AND WIFE—SEPARATE ESTATE.

Mingling wife's separate property with property of the husband,
discussed.   (p. 255.)

9. HUSBAND AND WIFE—SEPARATE ESTATE.

Where prior to April 1, 1869, a man married a woman entitled
to a legacy, under a will taking effect prior to that date, but he
did no act to reduce the legacy to possession prior to that date,
section 3, c. 66, of the Code made it her separate estate, cutting off
his right to reduce it to possession.   (p. 256.)

10. HUSBAND AND WIFE—SEPARATE ESTATE—EVIDENCE—DECLA-
RATION.

In a contest between creditors and a wife claiming property
levied upon as the husband's property under executions against
him, declarations of the husband as to the ownership of the prop-
erty are not admissable as evidence against the wife.   (p. 257.)

*Cleon Moore* and *J. J. Williams* for plaintiff in error,
cited 21 Ind. 454; 6 Watts & S. 290; 67 Am. Dec. 579;
55 Ga. 406; 18 W. Va. 97; 85 Va. 446; Id. 368; 34 W.
Va. 563.

*Forrest W. Brown* and *J. F. Engle* for defendant in
error, cited 1 Greenl. Ev. §§ 461, 462; 8 Gratt. 289; 30
Gratt. 652; 6 W. Va. 388; 7 W. Va. 348; 8 W. Va. 372;
18 W. Va. 75; 22 W. Va. 452; Id. 676, 673; 23 W. Va.
449; 27 W. Va. 206; 24 W. Va. 199, 203; 31 W. Va. 94,
104; Id. 428; 7 Am. & Eng. Ency. Law 138; 34 W. Va.
563; Best Ev. 78, 217; 1 Greenl. Ev. §§ 463, 465; 12 W.
Va. 699; 36 W. Va. 681; 1 Min. Inst. (t. p.) 337–343; 32
W. Va. 487; 21 W. Va. 224; 29 W. Va. 441; 102 Mass.
236; 115 Mass. 165; Am. Dig. (1889) 994; 24 W. Va. 409.

BRANNON, JUDGE:

Personal property was levied upon as property of James
H. Conklyn, under executions against him and his wife, and
Susan C. Conklyn, claiming it; and a trial was had by a jury
in the Circuit Court of Jefferson county, under Code, c.
107, ss. 1, 5, 6, to settle the right thereto between Mrs.

Conklyn and Trapnell and Croft, use, *etc.*, the execution creditors, resulting in a verdict finding part of said property to be the property of said James A. Conklyn. From the judgment carrying said verdict into execution Mrs. Conklyn obtained this writ of error.

The real merits of the case are involved in the motion of Mrs. Conklyn to set aside the verdict, because contrary to the evidence, which was overruled.

James H. Conklyn, becoming involved, on March 28, 1885, surrendered all his land and personalty, except seventy five dollars household goods, the estate conveyed being very considerable in amount, to his creditors by a deed of trust, under which, on April 20, 1885, the trustee sold the personal property, and in August, 1885, sold the farm, on which Conklyn resided, eighty one acres. Daniel Hefflebower, who is the brother of Mrs. Conklyn, purchased said farm for his wife, and it was paid for out of her separate estate. Daniel Hefflebower bought at the trustee's sale the wheat growing upon said eighty one acres for his sister, Mrs. Conklyn, also a roan mare, at the price of three hundred and fifty one dollars and sixty four cents, for the purpose of furnishing his sister with means to farm; and, acting for his wife, Hefflebower leased the farm to his sister Mrs. Conklyn, after he purchased it. Hefflebower sold the wheat and mare and colt to Mrs. Conklyn on credit at the same price he paid, and afterwards she cut the said wheat, and out of it partly paid for it and the mare and colt.

Mrs. Nancy Conklyn, mother of James H. Conklyn, in December, 1884, leased for no definite time another tract of land, which he on becoming insolvent turned over to his wife to be farmed, and which was farmed by her in connection with and in the same manner as the eighty one-acre farm.

Mrs. Susan C. Conklyn, while living with her husband, to some extent with his assistance and the assistance of her son, about eighteen years of age, and of a hired man, in 1885 put out a corn crop on both said tracts of land, using with the trustee's consent, until 29th April, the horses and farming implements of James H. Conklyn conveyed in said deed of trust.

While Mrs. Conklyn was farming she had the help of farming implements and horses lent to her by her brother, Daniel Hefflebower, and other assistance from him. He gave her five hogs to stock the farm. Thus equipped, she began farming both farms, the son, with the father's consent, working the farms with hands hired from time to time, and paid for out of the proceeds of the farm, the son having no contract, but receiving from time to time such amounts of money as could be spared, amounting to one hundred and fifty dollars, including clothing.

The husband was absent much of the time, selling machinery on commission for a firm, and for many months physically and mentally incapacitated by disease for work or business to any extent, and for a time in a hospital. When at home and not incapacitated, he gave some help on the farm, and to some extent assisted the wife and son in superintending and managing it. He acted generally as his wife's agent in selling and buying, but the son and Mrs. Conklyn's brother frequently took part.

From the proceeds of the farm so operated, and on credit given to her by it, the operating expenses, household expenses, and such articles as stock and other things as were needed were provided from time to time. At a sale of John Benner in March, 1886, a black mare was bought by Hefflebower for his sister, for one hundred and thirty seven dollars, on which was credited forty one dollars, the price of a colt of hers which had been sold at said sale, and its price taken up in the bill; and for ninety six dollars, the balance James H. Conklyn gave his note as his wife's agent, indorsed by Hefflebower, and paid by him when due. In March, 1887, at a sale of Col. Gibson's, Hefflebower purchased for his sister a bay horse, for which her husband as her agent gave his note, indorsed by Hefflebower, which was paid when due by young Conklyn, the son above mentioned, with Hefflebower's check for one hundred dollars to young Conklyn, lent by Hefflebower to his sister on the son's request, by his mother's direction; and the balance was paid by the son with money furnished by the mother.

On loans and the sale of said property by Hefflebower to his sister payments were made from time to time out of

the proceeds of the farm, and out of them and other transactions grew an account on which a balance remained unpaid, estimated to be some seventy five dollars.

The property levied on was derived as follows : The sorrel colt was the foal of the mare bought at Benner's sale. Two colts were descendants of the roan mare sold at the trustee's sale and the bay horse bought at Gibson's sale. A wagon was bought by James H. Conklyn, as agent for his wife, on credit, and paid for out of money supplied by the wife out of a payment by Daniel Hefflebower, as executor of his father, upon a legacy of three hundred dollars to Mrs. Conklyn under the will of her father, probated in 1867, which money was paid her in 1890. The hogs were the increase of those given to Mrs. Conklyn by her brother in 1885. A horserake was bought on the credit of the farm and paid for out of its proceeds. Crops levied on were raised on the farms in 1890, in the manner aforesaid. The verdict relieved the hogs and wagon from the executions.

At the date of the sale by the trustee, Mrs. Conklyn had no separate estate save the three hundred dollars legacy under her father's will.

The theory, upon which it is claimed that all the property found by the jury to be property of James H. Conklyn and liable for his debts was his, is that at the start, the date of the sale of his property under the deed of trust, Mrs. Conklyn had no separate estate whatever ; that she purchased the personal property purchased at the sale by her brother of him wholly on credit; that the property and its increase can not be regarded as the wife's, because it started with no separate basis; was not acquired with a separate estate ; that something can not come from nothing, so to speak, and a separate estate can not arise from mere credit to the wife not based on separate estate ; that the personal property was paid for out of the issues of the farms, which were produced by farming operations by the labor of the husband and his infant son, which of right belong to the creditors ; and so far as that labor may be said not to have produced such proceeds, or even if they had not contributed thereto, as the farm was operated by the wife, its proceeds are to be regarded as the wife's earnings, belonging by law to the

husband; and thus neither the property nor crops would be hers.

We can say on the facts certified as facts, that, when Daniel Hefflebower purchased property sold at the trustee's sale paying to the creditor's use, he became *bona fide* owner of it and sold it to his sister, Mrs. Conklyn. But it was sold on credit, and it is said separate estate can not arise from the wife's credit, but, if a purchase, it must be made with her separate estate.

There are decisions in Pennsylvania that a purchase by a married woman purely on credit, she having no separate estate, is but an acquisition by a married woman, and at the instant of the purchase it becomes the husband's property, even though it be paid for out of its own proceeds; but the current of authority and reason do not sustain this position. By the sale the title passes to the wife, not the husband, for he is not a party to it. Under common-law it would vest in him; but our statute broadly and unconditionally says that a married woman may take from any one save her husband, and hold to her sole use, any property, as if she were single. Under a purchase by a single woman she would be vested with legal title. The statute gives the wife capacity to take and hold as if single. Whence does the husband acquire title? The common-law on this point has been swept away. Where is the law that gives the man the title? We find one to give the woman title in Code, c. 66, § 3.

Mr. Bishop, with that strength of reasoning and analysis which characterizes all his law works, probes this matter to the bottom, and maintains the view that it is her separate estate. He says:

"If a third person makes a gift to the wife of property, real or personal, it, at the common-law, is an acquisition of which she is deemed the meritorious cause, and the thing given vests in the husband or wife or both, according to the same rules as anything else coming to her during the coverture. Now, suppose the third person, when he makes the gift, takes a promise of the wife to pay, binding in morals, not in law; plainly, in legal reason, this can make no difference. If, afterwards, another third person, not the

husband, makes good the wife's promise by paying the money, that can make no difference; and in such a case, if the vendor has merely agreed to convey the property to the wife, and has not conveyed, his undertaking, though the contract was void as to her by reason of the coverture, binds him.   In these cases, surely, under our statutes, the property is the wife's, though bought on credit, the same as though it came in any other way.   Then, again, suppose the vendor has chosen to vest the title in her before receiving any money, and the wife, by using the property in some way permitted by the statute, has accumulated the money to pay for it; this money is plainly her separate estate, and such the property will continue to be after her honorary obligation to make payment is discharged."   2 Bish. Mar. Wom. § 88.

The court of appeals of New York in *Knapp* v. *Smith*, 27 N. Y. 277, holds, that under the statute the married woman may acquire property, real or personal, by buying on credit, and no interest therein would pass to the husband, whether she antecedently had any separate estate or not; that if the vendor would take the risk of payment the transfer would be perfect; that she could hold the property, manage it by the agency of her husband or any other, and hold the profits and increase to her separate use.   It so held where the wife of an insolvent bought cattle which had been his from his assignee, giving her note for the price, and purchased the farm for the conveyance of which her husband had a contract, and she mortgaged it for the price, and subsequently employed the husband as her agent to manage the farm, the case being free from fraud.   Simiilar doctrine has been held in *Shields* v. *Keys*, 24 Iowa, 298.

The married woman who bought on credit the debts of her husband secured by his deed of trust on his goods was said, in the opinion in *Williams* v. *Lord*, 75 Va. 403, to take a good title as separate estate, though she might pay for them out of the proceeds of the sale.

*Robinson* v. *Neill*, 34 W. Va. 128 (11 S. E. Rep. 999) was a purchase on credit by a *feme* without separate estate, except a few articles which did not go into the land, and it was held that the land and its issues, and property purchas-

ed with such issues, were separate estate. Both opinions, particularly that of Judge Lucas, held this. The question that a credit-purchase would prevent its being separate estate was, it is true, not pointedly considered, but the opposite theory was sustained. The point was not even questioned. *Atwood* v. *Dolan*, 34 W. Va. 563 (12 S. E. Rep. 688); *Welsh* v. *Solenberger*, 85 Va. 446 (8 S. E. Rep. 91); *Keller* v. *Mayer*, 55 Ga. 406, and other instances. See Wells, Mar. Wom. 240, 241, 246.

But it is said that the husband is entitled to the wife's earnings, *Bailey* v. *Gardner*, 31 W. Va. 94 (5 S. E. Rep 636); *Campbell* v. *Bowles*, 30 Gratt. 652; and therefore, as she carried on business, the results are her earnings, and the crops and property paid for by them are liable because the wife contributed in their production. If so, then why does the statute empower her to hold separate estate? Simply that the estate should lie idle and unproductive? If she could get some one else to manage her separate estate, I assume the profits would be hers. Or would they still be earnings, and belong to her husband? Assuming that in such case such profits would be hers, is the result changed by the fact that she has capacity and industry to manage the estate so as to yield profits? I think not. Though profits arising from the use of her separate estate be in any measure the result of her skill and labor, they are still hers. Without asserting her right to engage generally in business, I think the true view is that, while the common-law does give the husband right to the wife's services and earnings, yet that is modified by the act giving her power to hold separate estate and its issues and profits, to the extent that, when her skill and labor in the use of separate estate do produce profits, they are hers, not earnings belonging to the husband. See Wells, Mar. Wom. 178; *Glover* v. *Alcott*, 11 Mich. 482; *Atwood* v. *Dolan*, 34 W. Va. 583 (12 S. E. Rep. 688) opinion; *Henderson* v. *Warmack*, 27 Miss. 835.

*Penn* v. *Whitehead*, 17 Gratt. 503, before the statute, recognized her right to engage in business, and gave her its results. So, it can not be because of any use of the wife's time, skill, and industry in the use of this property returning a profit that they are liable to the husband's creditors.

But the question may be asked, how can this married woman, living with her husband, carry on business in view of section 13, c. 66, Code (Ed. 1887) providing that a married woman living separate and apart from her husband may carry on any trade or business, and the property used in it and its profits and her earnings shall be her separate estate? Does not this exclude wives living with their husbands from carrying on business, from the fact that it limits that privilege to those living separate from their husbands?

This construction would be only inferential, as there is no positive prohibition. This section has no application to wives living with their husbands owning separate estates, but relates only to those unfortunate wives separated from their husbands. Without this statute the common law would rob the poor wife abandoned by her husband of all property coming from her toil, and of her hard earnings necessary for her very existence, and give them to the drunken husband himself, whenever he should claim them; and her employer could not even pay her wages free from his claim, and his creditors might claim property acquired by her in business, and she could not carry on business necessary for her support, because she could not contract, as her contracts would be void.

To remedy such evil, this statute was passed. It was not intended to trench on the right already existing of a married woman to use her separate estate and enjoy its profits. Under this section her property and earnings are the woman's, and by implication she has power to contract. *Peck* v. *Marling*, 22 W. Va. 708. I speak of this section as it was before chapter 109, Acts 1891.

But it is contended that, as the husband rendered some assistence in the conduct of farming, that renders the crops and the other property paid for out of them liable to his debts. Elaborate discussions of this subject are to be found in the text-books and reports, and in our own Court it has received full consideration in *Miller* v. *Peck*, 18 W. Va. 99, and *Atwood* v. *Dolan*, 34 W. Va. 563 (12 S. E. Rep. 688). The husband can not be compelled to labor for his creditors. There are cases where the creditors can subject an accumu-

lation of property, the result distinctly of the husband's labor and talents in connection with her separate estate, or an apportionment; but generally speaking, as a man is entitled out of his own labor to the bread of life first, and is under obligation to support his wife and family, the courts, from the necessity of the case, have felt themselves constrained to say that from the mere fact that a husband devotes his time and labor upon his wife's separate estate, and profits result, such profits do not go to him or his creditors; for, if so, he and his wife and children would in most cases, where his wife has a little home coming from some kinsman, and he hopelessly insolvent, starve. *Miller* v. *Peck, supra; Atwood* v. *Dolan, supra; Gage* v. *Dauchy,* 34 N. Y. 293; *Knapp* v. *Smith,* 27 N. Y. 277.

A husband in the enjoyment of marital right lives and is maintained on wife's land, which she manages for her use, and he voluntarily bestows labor upon it. This was held not to give him or her creditors right to crops. *Rush* v. *Vought,* 55 Pa. St. 437. See opinion in *Hamilton* v. *Booth,* 55 Miss. 60.

In *Feller* v. *Alden,* 23 Wis. 301, it is held that a wife may cultivate her land by means of the labor of her husband and their minor children without divesting herself of its products, so as to subject them to execution against the husband, and it is not proof of an arrangement to defraud creditors.

In Kentucky the court held that products of a wife's farm, through the labor and skill of the husband, follow the title to the land, and are hers, though not if his services exceeded in value the cost of support of himself and family; the obligation of that support being held paramount to that of paying his debts; and until he made provision for that obligation the products of her farm could not be made liable to his debts, and not then unless it was shown that the part not needed for the support of himself and family was the result of his labor. *Com.* v. *Fletcher,* 6 Bush 171, 172.

Mr. Bishop, in 2 Law Mar. Wom. § 301, takes issue with the Kentucky court in saying that the surplus after support might be reached, saying it could not be unless there was an agreement to pay him the excess.

The husband is bound to support himself and family, including his wife, and she is not bound to support even herself to his relief, even if she have. separate estate. 1 Bish. Mar. Wom. § 57; 2 Bish. Mar. Wom. §§ 72, 158, 159; Wells, Mar. Wom. p. 135. This debt on the husband is prior and paramount to every money-debt to others, from the very nature and necessity of the case; neither he nor wife nor family ought to starve or be pinched with want to pay mere money-debts. No just law can underrate this great and high debt to obligations of mere money.

Courts will not allow husband and wife to use this right to cloak fraud against creditors, but will ferret out the fraud with very suspicious and acute eye, so far as human testimony will enable them to do so, failing sometimes, it is true, for want of evidence, but generally succeeding in doing justice in cases of real fraud; but they will not, by an unbending, iron rule, hold in every case that mere participation by the husband in the production of profits out of the wife's lands or other property will make them liable to creditors, and impose starvation on the whole family. No slavery could be more oppressive and hard than such slavery of unfortunate debtors to creditors.

Courts of equity, in proper cases, where substantial property traceable to the skill and labor of the husband is found to exist, will make a just apportionment between the wife and her husband's creditors. *Penn* v. *Whitehead*, 17 Gratt. 503, 513; *Glidden* v. *Taylor*, 16 Ohio St. 509.

The fact that the husband acted sometimes as the wife's agent in the conduct of their small business, along with her brother and son, can not alter the case; for the cases of *Miller* v. *Peck*, *supra*, and *Atwood* v. *Dolan*, *supra*, sustain the position that a married woman with separate estate may barter and trade with reference thereto by her husband as agent, and will be entitled to the increase thereof. The mere marital relation does not disqualify the husband from acting as his wife's agent with reference to her separate estate. *Prentiss* v. *Paisley*, 25 Fla. 927 (7 South. Rep. 56); *Keller* v. *Mayer*, 55 Ga. 406. The mere fact that he is agent will not render her property or its profits liable to creditors. Wait, Fraud. Conv. § 303; *Voorhees* v. *Bonesteel*, 16 Wall. 16; *Aldridge* v. *Muirhead*, 101 U. S. 397.

In this case the unfortunate husband, smitten with accumulated misfortune, disease, physical and mental, sending him to a hospital, contributed very little in the family struggle for existence; in fact, he must have been a charge, rather than a help. We can not say that any accumulation came from his labor, but from the young son and the kindly helping hand and counsel of the wife's brother, Daniel Hefflebower. Where husband and wife unite in fraudulent purpose to divert the husband's considerable earnings, and hide them from creditors, under the shelter of her separate estate, the case is different. No fraudulent purpose of the wife appears in this case. She, with the help of her brother, was struggling almost for life itself. The husband had nothing to hide from creditors, either in estate or ability to labor. He does not appear to have been guilty of intentional fraud. He surrendered everything to creditors, and was left penniless and broken in body and mind. He travelled some, selling machinery, and gave his earnings to one of the creditors in this case.

On the facts proven, we could not find fraudulent intent. Under the facts, not evidence, as certified, the source from which the property came, and how paid for, appear, and none came from the husband. Clearly it came from the wife's estate. Any idea that it came from the husband is repelled.

It is further contended that because the son, Edgar A. Conklyn, labored earnestly in the family distress, and as under the law his services belonged to the father, this makes the products of land and property liable for his debts.

The father has a right to the son's services and earnings in consideration of his support and care in tender years of helplessness; but he may emancipate the son, and thus the son becomes entitled to his own services and earnings; and may dispose of them as he pleases. Creditors can not compel their debtor to work himself or to compel his children to work for them, nor sell under process their future service, though property created by their past labor may be subjected. Even a parent involved in hopeless insolvency can thus emancipate his child, and remove his services and

earnings from the grasp of creditors. Such emancipation may be oral or written, may be proven by circumstantial evidence, or may be implied. *Halliday* v. *Miller*, 29 W. Va. 424; (1 S. E. Rep. 821 and 6 Amer. St. Rep. 653 and note) *Penn* v. *Whitehead*, 17 Gratt. 503; *Wilson* v. *McMillan*, 62 Ga. 16 (35 Amer. Rep. 115 and note discussing the subject generally).

In *Wilson* v. *McMillan*, just cited, the right of an insolvent father to emancipate his child, who remained at home, and was hired by the father, was upheld. Were these doctrines not to prevail, the child would for years be engulfed in his father's ruin and bankruptcy, unable to get support, unable to obtain an education for the struggle of life, his whole future blasted.

In this case the son did remain at home; but reason holds that, if the law allow such emancipation at all, it would not require as a condition of its exercise that the ties of home be broken, and the child driven from the parental roof. In this case, if we can not say the father emancipated the child, we may say certainly that he consented that he might give his labor to his mother.

In the case of *Wilson* v. *McMillan,. supra,* the court says that the debtor may give his own labor away : he may consent that his child may give his labor away. A court should look with special liberality upon the consent of a father to his son laboring for his own mother, striving for a living, when that labor gave to himself and his mother the bread of life, when the father, broken by insolvency and disease, in estate, body, and mind, was unable to give them maintenance.

In *Atwood* v. *Dolan*, 34 W. Va. 563 (12 S. E. Rep. 688) the fact that seven sons labored on the farm in producing crops was not considered enough to destroy the wife's right.

*Rush* v. *Vought*, 55 Pa. St. 437, holds that where sons, with their father's consent, labor on wife's land, this will not render crops liable to his creditors.

These principles lead to the conclusion that the products of the eighty one acres are not liable to the husband's debts; nor are articles purchased with them.

But how as to the products of the other tract? This question presents more difficulty. If we were bound to say that the lease of this tract was vested in James H. Conklyn, and he sublet to his wife, we might have to say that this subletting would be void, and the lease still the husband's, and that the right to its crops would follow the right to the land, and be the husband's, notwithstanding the wife contributed in their production with her stock, implements, and hired labor. *Hamilton* v. *Booth*, 55 Miss. 60 ; *Rush* v. *Vought*, 55 Pa. St. 437. It would be a mingling of her separate estate with his beyond distinction, and thus fall under the principle that, where she allowed her separate estate to be indistinguishably mixed with the husband's property, hers is lost to her as separate estate, as regards his creditors. Wells, Mar. Wom. 119 ; 2 Bish. Mar. Wom. § 88 ; Id. §§ 818, 820; *Glover* v. *Alcott*, 11 Mich. 470 ; *Glidden* v. *Taylor*, 16 Ohio St. 509. And thus, not only the crops, but perhaps all the property, save only the crops in kind of the eighty one acres, would be liable, because the products of the other tracts helped in buying such property.

But we do not regard the lease of this farm (Mrs. Nancy Conklyn's farm) as the leasehold property of James H. Conklyn. It was farmed until April, 1885, by another son of hers, and about Christmas, 1884, there was an indefinite arrangement between James H. Conklyn that he was to farm it, for what term we do not know ; but before doing anything he told his mother that, owing to his insolvency, he could not do so, and wished to give it up, and she replied "she did not wish to make any more changes, and he should keep the land, and make the best arrangements he could with it, and accordingly he turned it over to his wife," by whom it was held and farmed just as the other farm, she paying landlord's share of crops. We think he acted as his mother's agent in leasing to the wife, making it the wife's lease. He had no substantial estate in it, one worth anything to creditors ; for as regarded his leasehold, the work of making crops and the burden of paying rent were yet unperformed. On the facts certified as facts, we hold that the law does not hold that property liable to said executions.

Instructions: I shall not pass upon the one called "court's instruction," as I do not think the record shows that it was objected to or excepted to.

Defendants' instructions 1 and 2 are based upon principles of law above stated, and need not be discussed. It is only necessary to say, for the purpose of future proceedings in the case, that as given they seem to put the law correctly.

Defendants' instruction 3, that if James H. and Susan Conklyn were married prior to April 1, 1869, without marriage contract, and she acquired by the will of her father, prior to that date, three hundred dollars, and she or her husband with it purchased any of the property levied upon, or any property of which that levied upon is the increase or product, then such property was the husbands, is erroneous. On April 1, 1869, section 3, c. 66, as part of our Code, took effect. It is not retroactive, but declares that any married woman "may take" and hold property as separate property. If the husband, on April 1, 1869, had such a vested right in his wife's legacy as was property, the statute would not affect it—*First*, because we would not construe it to retroact upon vested property rights; and, *secondly*, it would be unconstitutional so applied. But the husband's right under the law prior to that date gave him his wife's choses in action only conditionally; that is, upon reduction to possession. Till that act the property therein was not vested in him, but in her; as, if he died, she surviving, she retained it, which could not be if it had perfectly vested in him. Therefore, the husband not having reduced the chose to possession when the Code took effect, we can say the wife took the chose; the new law operated upon it before the act of reduction to possession took place. Moreover, I do not see how creditors could, in the manner proposed in this proceeding, avail themselves of his right, he having done no act to reduce the chose to possession, nor have the creditors resorted to any process available to do so; but I have not fully considered this, it not being necessary to do so. The New York courts hold the doctrine that it is a vested right in the husband, which can not be divested by legislation. *Westervelt* v. *Gregg*, 12 N. Y. 202 (62 Amer. Dec. 160, and note, p. 167).

But the weight of decision is adverse to this view. *Alexander* v. *Alexander*, 85 Va. 353 (7 S. E. Rep. 335) and cases cited; 1 Bish. Mar. & Div. § 675; 2 Bish. Mar. Wom. § 45; *Price* v. *Sessions*, 3 How. 635 (opinion) Wells, Mar. Wom. 93, holds the New York opinion; so Wade, Retro. Laws, § 184.

Another error in the court below was the admission in evidence of a letter from James H. Conklyn to his brother Charles. Charles was surety for James H., in these debts. James H., as a witness, stated that he had conversations with Charles in which he asked him to still run the notes, and, if he would do so, his wife would pay them out of crops raised by her, and that he acted as agent for his wife and never otherwise. The defendants then introduced the letter in which James H. Conklyn promised unequivocally to pay the debts out of the wheat crop, not hinting anything as to agency.

It is very evident that the defendants desired to get the full benefit of the absolute statement of James H. Conklyn as a declaration by him that he owned the wheat crop and would pay the debt out of it, and did not want to use it simply to impeach the veracity of a witness, else the letter would have been offered for that purpose only. It was admitted in evidence generally, and it can be readily seen how much calculated it was to influence the jury to the prejudice of the plaintiffs in the issue. Used for and limited to impeachment purposes it was admissible; but not otherwise, for it is simply unsworn statement, hearsay, not at all binding on the wife. *Glover* v. *Allcott*, 11 Mich. 470, in just such a contest as this, holds that the declaration of the husband is not admissible against the wife. 2 Whart. Ev. § 1215; 1 Greenl. Ev. § 100. It is inadmissible under the general law of evidence, without regard to the relation of husband and wife, or the nature of the suit.

The judgment is reversed, verdict set aside, and new trial awarded.

REVERSED.   REMANDED.