## CHARLESTON.

RILEY *v.* RILEY *et al.*

Submitted June 8, 1893. · Decided November 18, 1893.

1. MINORS—IN LOCO PARENTIS —WAGES—SERVICES.

Where a minor lives with his uncle as a member of his family, the uncle furnishing him with food, raimant and shelter, and the minor rendering to his uncle his services without any contract or mutual understanding as to compensation for support or wages to be paid, such minor can not recover from the uncle nor from his personal representative the value of the services thus rendered, though the value of such services may have been greater than the value of such support.

2. MINORS—IN LOCO PARENTIS—WAGES—SERVICES.

But the uncle may give or release to such minor the right to his wages earned elsewhere, if it affirmatively appear or may fairly be inferred from the nature and circumstances of the case, that such was the understanding of the parties —a question of fact to be determined by the jury subject to the proper control of the court.

3. A case in which these two principles are applied.

. J. R. DONEHOO, of counsel for appellee cited Abb. Tr. Ev. 368; 1 Greenl. Ev. § 207; 20 W. Va. 410; 2 S. E. Rep. 454; Steph. Ev. Art. 15; 17 S. E. Rep. 96; Schou. Dom. Rel. § 274; 1 Greenl. Ev. § 138; 28 N. E. Rep. 651; 14 S. E. Rep. 12; 30 W. Va. 27; 29 W. Va. 98; 28 W. Va. 379; 26 W. Va. 30; 20 W. Va. 183; 34 W. Va. 766; 21 W. Va. 709; 26 W. Va. 338; 13 S. E. Rep. 391.

J. J. JACOB, for defendant in error cited 1 Bl. Com. 453;

2 Kent. Com. 179; Id. 201; Wood Mas. & Serv. 15–22; Sch. Dom. Rel. 252; Code c. 82, s. 7; Id. c. 122; Id. c. 46, s. 14; 9 Pa. St. DeFrance *v.* Austin; 59 Vt. 505; 3 N. Y. 312; 1 Yeates 209; 4 Yeates 353; 28 N. Y. 494; 46 Vt. 571; 17 Vt. 560; 15 N. H. 486; 15 Pick. 510; 4 Mass. 675; 4 N. Y. 38; Wood M. & S. 60; 2 Law. Rights and Rem. § 810; 39 Ia. 681; 3 N. Y. 312; 60 N. H. 20 (49 Am. R. 302); 9 Pa. St. 309; 79 Pa. 421, 427; 105 Pa. 266, 267; 111 Pa. 460; 126 Pa. 404; 96 N. C. 149; 65 Ia. 57; 58 Vt. 375; 41 Kan. 206; 29 W. Va. 431; 59 Vt. 505 (10 Atl. Rep. 722); Hurst Adm'r, *v.* Hite, Adm'r, 20 W. Va. 183; Fisher *v.* Fisher, 5 Wis. 472; Rob. Forms 135.

HOLT, JUDGE:

The common-law system of pleading as modified by statute still prevails in this state. This is an action of *assumpsit*, brought in the Circuit Court of Hancock county on the 10th day of January, 1891, by Isaac Riley, defendand in error, against William H. and Frederick J. Riley, as executors of the will of Enoch Riley deceased, the declaration containing two of the common counts in *assumpsit* —one for work and labor, and the other for money had and received.

Plaintiff also, according to the requirement of section 11, c. 125, Code, filed with his declaration an account or bill of particulars, stating distinctly the several items of his claim, amounting to the sum of one thousand two hundred dollars as sued for and set out in the declaration. It was composed of two items, viz.: The price paid for plaintiff's labor in the East Liverpool potteries, and received by defendants' testator, from March, 1878, to February, 1887; (2) the value of the work done by plaintiff for testator during the same period, when he was not at work in the potteries.

On November 12, 1891, defendants appeared by their attorneys and entered the plea of *non-assumpsit*, issue was joined, and a jury impanelled and sworn to try the same. Twelve witnesses were examined on behalf of plaintiff; none was called by defendants. During the progress of the trial, defendants moved to exclude parts of the testimony of certain witnesses on the ground of incompetence, but the

court overruled the motions, and defendants excepted, and, at the conclusion of plaintiff's testimony, defendants moved to exclude it, without saying upon what ground. This motion the court overruled and defendants excepted. Defendants offered no testimony, and, the case being submitted to the jury, they brought in a verdict for plaintiff for one thousand one hundred dollars.

The defendants then moved the court to set aside the verdict and grant a new trial, upon the ground that the verdict was contrary to the law and the evidence, and because of the rulings made during the trial; but the court overruled the motion, and rendered judgment for the damages found by the jury, viz. : One thousand one hundred dollars, with interest from the 5th day of December, 1891, and costs, and signed and certified, as part of the record, defendant's bill of exceptions setting out all the evidence.

Passing by, for the present, the question raised during the examination of the witnesses, and considering the motion for a new trial, the question is : What are the facts proved, or what does the evidence fairly tend to prove? For unless the verdict is without evidence to support it on some essential point or plainly insufficient to warrant the finding of the jury, the ruling of the court below must be sustained.

For our purpose, and in the present attitude of the case, the record discloses the following facts : The plaintiff Isaac Riley, was born in England. His parents came to Trenton, N. J., where his mother died December 2, 1875, and his father on the 2nd day of February, 1878. He was twelve years old on the 19th day of February, 1878. He came to the house of his uncle, Enoch Riley, the testator of defendants, in March, 1878, where he made his home as a member of his uncle's family until he was twenty one years of age. His uncle, in 1879, obtained work for him, where some of his sons were at work in the East Liverpool potteries, across the Ohio river, where he worked about three hundred weeks at an average of four dollars per week, which was paid to him in money every two weeks, and which he took home and delivered to his uncle, amounting in the aggregate to about one thousand two hun-

dred dollars. He began this work at seven in the morning, quitting sometimes at five and sometimes at six o'clock in the evening. A full week was six days, but the potteries ran on an average, in his kind of work, only about ten days of the two weeks. He was honest, of good habits and industrious. It was his business to help milk his uncle's cows, take the milk and sometimes vegetables across the river to the customers, and when not engaged at the pottery, he was employed in sawing wood and doing various kinds of work about his uncle's house and farm. During the time, Enoch Riley said he intended to provide for the plaintiff, Isaac, just the same as for his own children. The money from the potteries was brought home in an envelope and he would sometimes refer to it as Isaac's money. He induced his nephew to buy a lot from him and to build a house on it, he furnishing the money and taking a mortgage, which is still subsisting; but he said to one of the witnesses that he intended to leave the house to Isaac—to release the mortgage. This was when Isaac was not present, but he did sometimes in his presence speak of his nephew being a good boy, and of turning over his wages to him. To another witness he frequently said that "he intended to recompense Isaac for his work."

On the part of defendants it is claimed that Enoch Riley, the testator, stood *in loco parentis* to the plaintiff from the time he was taken into his family as a member thereof until he attained the age of twenty one and was entitled to his services and his earnings.

On the other hand, it is claimed for plaintiff that the relation of father and son did not exist in contemplation of law, as to the matter here involved, and that, if it did, there is enough in the testimony to warrant the jury in saying, that plaintiff had been emancipated as to the right to the wages earned by him in the potteries, or that there was enough to warrant them in drawing the inference that Enoch Riley promised plaintiff that he would receive and hold such wages for plaintiff's use and benefit, to be paid over or accounted for when he attained his majority; and that such promise was in no view a merely gratuitous promise, but was supported by a sufficient consideration;

that he took upon himself the character of a trustee of the fund, receiving it under such circumstances as made him legally responsible therefor.

It appears from the testimony, that Enoch Riley told one of the witnesses, that he and Isaac had had a falling out; that Isaac had his clothes tied up, and said he was going to leave; that he told Isaac that he could not leave because he was adopted, and that he would follow him; that the trouble amounted to nothing; that he found Isaac truthful and honest in every respect; and that he intended to provide for him as he did for his own children when he came of age.

By chapter 122 of the Code, as amended by act of March 20, 1882, and as the law now stands, he could have adopted his nephew, in which case he would have been invested with every legal right in respect to obedience and maintenance on the part of the child as if said child had been born to him in lawful wedlock; and the child would have been invested with every legal right, privilege, obligation and relation in respect to education, maintenance and the right of inheritance in the estate of such adopting parent or parents, as if born to them in lawful wedlock with certain exceptions not material here. See Code c. 122, s. 4. So, under chapter 81, Code, plaintiff might have been bound as an apprentice to his uncle, to continue until he had attained the age of twenty one years.

But neither of these things was done. Plaintiff worked first in the pottery of Knowles, Taylor & Knowles, but at what wages, if any, and for what time, does not appear, except that it did not extend into the latter part of the year 1879, for at that time he went into the pottery of Laughlin, where he did work, "running molds" for about two years up to Christmas, 1881, receiving during the first year three dollars and fifty cents per week, and the second year four dollars per week, working about ten days in the two weeks, and receiving his pay in money every two weeks, which he carried home and delivered in the package or envelope to his uncle. From that time he worked in the pottery of West, Hardwick & Co. for eleven months at four dollars per week, averging about ten days' work in

every two weeks. He worked in Barnes's pottery about seven months between July, 1882, and August, 1883, receiving four dollars and fifty cents per week. He worked in the pottery of C. C. Thompson & Co. from the 4th of August, 1883, until February 26, 1887, when he attained his majority, (February 22, 1887), and he was paid therefor in all, by this firm, the sum of six hundred and twenty dollars and nine cents.

So that during the nine years in controversy he worked three years, say nine hundred working days, wholly for his uncle, and six years, say one thousand eight hundred working days, in the potteries, during the same time cutting wood, *etc.*, and milking and carrying milk across the Ohio river for his uncle, and receiving during that time, as his wages in the potteries, not less than one thousand one hundred dollars, which, as received from time to time, he turned over to his uncle.

The evidence tends to show that he was permitted to earn this money for himself. He evidently contracted himself with all the pottery firms and companies except the first. The pay rolls and accounts, as far as they appear, were made and kept with him, and the wages were paid directly to him. For instance, the witness B. C. Simms, a member of the firm of C. C. Thompson & Co., where plaintiff worked for about four years and six months, produces a copy of his pay-roll, with the itemized payments, amounting to six hundred and twenty dollars and nine cents, saying: "Everything on that paper was paid to Isaac Riley himself, and I do not know whether the moneys, or any of them, paid to Isaac Riley, were by him paid to Enoch Riley;" showing that he evidently regarded himself as dealing with Isaac Riley, but with the knowledge and consent of the uncle where Isaac lived. The evidence also tends to show, that Enoch Riley regarded himself as a kind of savings bank or safe-deposit of these earnings for the use and benefit of Isaac Riley. More than once, with the package or envelope containing plaintiff's two weeks' earnings in his hand he said: "This money or this envelope is Isaac's," which in the circumstances is at least fairly capable of the meaning that he regarded himself as

holding it, not as his own, but as trustee for his nephew, who had earned it. He labored constantly for his uncle when not at work at the pottery, and did a very considerable amount of work for his uncle, day by day, after his work at the pottery was over in the evening, and before it commenced in the morning. The evidence does not show that he attended school at all.

There was nothing to compel him to remain with his uncle, and nothing to induce him, so far as his own interests were concerned, except upon the theory that he was paying his board among his kinsfolk by extra labor, and laying up for a start in life his earnings at the pottery. It is only on some such theory that the facts and circumstances of the case can be explained, and the conduct and declarations of the parties given an intelligent meaning. It is not probable from the evidence that any such understanding or agreement was come to between them in the beginning, but that the young orphan boy was taken into the home of his uncle among his kindred as a member of the family, and that his uncle during the first year at least stood to him in the place of a parent; and there is nothing in the record that has the effect to exclude the inference of the continuance of such *quasi* paternal relation down to plaintiff's attainment of his majority.

But, whether it continued or not, there evidently came a time when there was a more definite understanding as to what each was to do and receive. Some time, perhaps in 1882, he and Isaac had some trouble. Isaac had his clothes tied up, and said he was going to leave. In a conversation with a neighbor about it, testator said that he had told Isaac that he could not leave, because he was adopted, and that he would follow him. This was not true, but Isaac for some reason became reconciled, and remained until he was twenty one years of age.

There are but few Virginia and West Virginia cases bearing upon the points of law directly involved. The doctrine is well settled that the father is entitled to the labor and services of his minor child, and may maintain an action to recover for the services of such rendered to any third person. *Halliday* v. *Miller*, 29 W. Va. 424 (1 S. E.

Rep. 821 and 6 Amer. St. Rep. 653); 2 Kent Comm. 193 (13th Ed.), notes. But the father may emancipate the child whenever he chooses to do so. This right is not within the control of his creditors, and they can not prevent an insolvent father from relinquishing all right to the future earnings of his child. *Penn* v. *Whitehead*, 17 Gratt. 503; *Trapnell* v. *Conklyn*, 37 W. Va. 242 (16 S. E. Rep. 570). The emancipation may be inferred from circumstances, and whether the circumstances establish an emancipation is a question of fact for the determination of the jury. *Bearer* v. *Bare*, 104 Pa. St. 58; *Ream* v. *Watkins*, 27 Mo. 516. The emancipation may be complete, though the child continue to reside with its parents. *Rush* v. *Vought*, 55 Pa. St. 437. See note to *Halliday* v. *Miller*, 1 S. E. Rep. 821 (6 Amer. St. Rep. 653–664). He may give the child his earnings. *Monaghan* v. *School Dist.*, 38 Wis. 100; Bish. Cont. § 230. The father's consent for the son to receive his own earnings is put on the same footing with a gift delivered. *Benson* v. *Remington*, 2 Mass. 113–115; *Jenney* v. *Alden*, 12 Mass. 375–378; *Whiting* v. *Earle*, 3 Pick. 201; and the consent may be implied, *Burlingame* v. *Burlingame*, 7 Cow. 92; *Johnson* v. *Silsbee*, 49 N. H. 544. See Hammond's Bl. Comm. notes, p. 797; *Cloud* v. *Hamilton*, 11 Humph. 104 (53 Amer. Dec. 778, and notes); Schouler Dom. Rel. §§ 273, 274; 2 Kent. Com. (13th Ed.) 193, note b; 1 Min. Inst. 437, 438.

Ordinarily, where one person renders services for another, which are known to and accepted by him, the law creates an obligation called an "implied promise" on his part to pay for such services a reasonable compensation, unless there be something in the relation of the parties or the circumstances of the case, which precludes the idea of such compensation, in which case there would be an implied agreement or understanding that such compensation was not to be paid. See *Hurst* v. *Hite*, 20 W. Va. 183–204, 205; *Rea* v. *Trotter*, 26 Gratt. 585; *Harshberger* v. *Alger*, 31 Gratt. 52.

"But where it is shown that the person rendering the service is a member of the family of the person served, and receiving support therein, either as parent, child, or

other near relative, a presumption of law arises that such services were gratuitous. The conditions are not such as show a mutual intention to contract, according to the ordinary course of dealing and the common understanding of men. Therefore, before the person rendering the service can recover, the express promise of the party served must be shown, or such facts and circumstances as will authorize the jury to find that the services were rendered in the expectation by one of receiving, and by the other of making, compensation." 17 Am. & Eng. Enc. Law, p. 336, and cases cited. It applies to those who occupy the relation of parent and child, and to those who occupy the *quasi* parental relation, as a nephew living with his uncle, and a natural son living with his father.

In *Broderick* v. *Broderick,* 28 W. Va. 378, it was held that, in the absence of direct proof of an express contract the surrounding circumstances authorize a natural son to recover from his father pecuniary compensation for work and labor done for, boarding and nursing furnished to, and money advanced, paid out and expended for the father in his lifetime. Yet I take the law to be that, if the nephew, as in this case, come to live with his uncle, "and live in his family for years as a child lives with his parents, rendering services, and receiving in return shelter, clothing and subsistence, without any distinct contract as to wages, the latter can not thereafter recover wages of the former or of his executor or administrator, although the value of the services rendered may have been greater than the value of the clothing and subsistence received; and the reason is, that for the law to raise such a promise would be to raise a promise directly opposed to the obvious understanding of the parties." 1 Thomp. Trials, 894.

Therefore, I am of the opinion that from the understanding to be inferred from the *quasi* parental relation, if not from the express understanding to be drawn from the facts and circumstances, the plaintiff, Isaac Riley, was not entitled to recover anything from the estate of his uncle, Enoch Riley, on his first account, for the work, care and labor *etc.*, performed and bestowed in and about the business of Enoch Riley, because he has failed to overcome by affirma-

tive evidence the presumption which prevails by reason of the existence of the family relation. See *McGarry* v. *Roods*, 73 Ia. 363 (35 N. W. Rep. 488).

For the same reason, among others, I think the finding of the jury for plaintiff on the second count, for money had and received by defendants' testator for the use of plaintiff, was not an unwarranted verdict, caused by their sympathy in a hard case, but was justified by the application of the principles and rules of law already mentioned to the facts and circumstances of the case: (1) Plaintiff was not the son but only the nephew. (2) The work was away from home across the Ohio river in another state; the amount received was small, about sixty six and two third cents per day, and, when it was delivered to the uncle, the evidence tends in some degree to show, that he considered himself as holding it for his nephew's use and benefit. (3) When not engagaged in the potteries, say one third of his time, he was constantly and faithfully at work for his uncle, and when at work in the potteries he did every day a considerable amount of work for his uncle about his house, farm and dairy. (4) He was induced by his uncle to buy a lot and build a house upon the supposition that he had money coming to him which would enable him to pay, so that the mortgage thereon would be lifted or released.

It is further said, on behalf of defendants that, if plaintiff had been entitled to a verdict, the one rendered was excessive. In the estimate of plaintiff's counsel of the amount of earnings, the first year is properly left out, for there is no evidence of the amount. They make the aggregate, as justified by the proof, one thousand two hundred and sixteen dollars and forty seven cents. Counsel for the defendants make it eight hundred and thirty five dollars. I make it, on the same basis, one thousand and fifty dollars and nine cents. The evidence leaves no guess work about it, and one thousand one hundred dollars, the amount found by the jury, is a safe, as well as a close, approximation. No interest thereon was found or allowed.

Twelve witnesses were examined by plaintiff, and cross-examined by defendants, but no witnesses were called on

their behalf.    Both examinations are brief and to the point. No disposition is shown to make captious or hypercritical objections to questions, but during the examination of the witnesses defendants moved to strike out the testimony of the witnesses Rigby and Barnes as to the industrious habits of the plaintiff.    The first count was on a *quantum meruit*, which involved the worth of plaintiff's services, and the character of plaintiff's habits, skill, *etc.*, was pertinent and admissible.    Abb. Tr. Ev. 368.

Defendants moved to exclude that part of the testimony of the four witnesses, Stephenson, Robinson and the two Jacksons, which gave the declarations of Enoch Riley to befriend and requite his nephew.    This was relevant, and it was for the jury to give it its proper weight in determining the issues of fact involved.

Defendants also moved to exclude the testimony of the witness Metz, giving the conversation of the testator during his last illness, after plaintiff had ceased to live with him.    Testator told witness that he had raised Isaac, that he was a good boy, that he had made a man of him, and that he intended to do well by him.    This was admissible, together with the other evidence, as tending to prove an agreement to compensate, or at least as tending to show the relation between the parties which was in issue.

In conclusion, as to all these exceptions to evidence, all the evidence is set out and certified in the bill of exceptions, and it appears affirmatively that they were merely cumulative, and, even 'if defendants' motion to exclude were improperly overruled, the defendants could not have been prejudiced by such rulings.    See *Hull* v. *Lyons*, 29 W. Va. 410-421 (1 S. E. Rep. 582).

With the growth of business and the increase in the number and prolixity of trials the modern tendency is very decided to let well enough alone; if the court can from the record clearly see that substantial justice has been done, notwithstanding some trival or technical error of the trial-court in a ruling on some question necessarily decided on the spur of the moment, to treat such error as harmless— as something which did not and could not affect the general result.

For the reasons given, we think the judgment complained of should be affirmed.